FLETCHER, RECEIVER *v.* STUTZ AUTOMOBILE COMPANY OF AMERICA, INC.

[No. 13,187. Filed November 15, 1929. Rehearing denied November 19, 1930. Transfer denied April 26, 1933.]

400

*Miller, Dailey & Thompson, Jess B. Fields, Samuel D. Miller* and *Sidney S. Miller,* for appellant.

*Roemler, Carter & Rust,* for appellee.

McMAHAN, C. J.—This is an action by William H. Fletcher, as receiver of Weidely Motors Company, hereafter referred to as Weidely, against the Stutz Motor Car Company, hereafter referred to as Stutz, to recover damages alleged to have been sustained by Weidely by reason of the failure of Stutz to take and pay for a large number of motors which it is claimed the latter ordered Weidely to manufacture for it pursuant to a prior written contract. A trial by jury resulted in a verdict and judgment for the defendant. Plaintiff appeals and assigns as error the overruling of his motion for a new trial, the specifications of which challenge the sufficiency of the evidence, the giving and refusing to give instructions, the admission and exclusion of evidence. The cause was tried on the issues presented by a complaint in two paragraphs, and by an answer of denial and of payment.

The first paragraph of the complaint alleges that in

June, 1932, Weidely and Stutz began negotiations look-
ing to an agreement whereby Weidely would manufac-
ture and sell, and Stutz would buy motors to be used in its
motor cars.  These negotiations resulted in a contract
under date of December 5, 1922, the salient features of
which are as follows:

Weidely agreed to manufacture for and to sell to Stutz
and Stutz agreed to purchase its requirements, between
December 5, 1922, and December 31, 1923, of a certain
model gasoline engine, production of which would begin
January 1, 1923, the buyer's first order to be placed
therewith and to be confirmed by a regular purchase
order, and to cover 500 engines for delivery as therein
specified; the engines to be same design as sample, unless
altered by mutual consent.  Seller to warrant engines to
equal sample in material, workmanship and perform-
ance.  Upon development of any objectionable features,
buyer was given the right to cancel contract unless seller
promptly made corrections; seller to deliver engines
without charge for boxing, crating or cartage at buyer's
plant in Indianapolis, at such times between date of con-
tract and December 31, 1923, as buyer might designate
on its *regular purchase orders.  Weidely agreed to
increase or decrease deliveries as Stutz directed upon
receiving from buyer notice so to do.*

Weidely agreed to carry an excess stock of repair parts
of the motors and not to sell motors to anyone except
Stutz and Auburn without the written consent of appel-
lee, except seller had the right to complete contract with
H. C. S. Motor Car Company.  In case of insolvency of
either party, in case application was made to have
either declared bankrupt, or in case of the appointment
of a trustee or receiver for either or in case of default in
the observance of any of the covenants, the party affected
might cancel the contract without notice.  No agree-
ments or understandings between parties not expressed

in the contract and no alterations or variations of the terms thereof were to be valid or binding upon either party unless made in writing and signed by both parties.

After setting out the contract, this paragraph alleges that from December 5, 1922, to July 19, 1923, appellee, pursuant to the contract, ordered Weidely to manufacture 4,000 motors, which orders were accepted, said motors to be delivered to appellee from time to time between December 5, 1922, and October 1, 1923, as rapidly as the exigencies of the business of Weidely and the market for material to be used in the motors and labor and manufacturing conditions would permit; that during said period Weidely manufactured and delivered to Stutz, under the contract, 2,191 motors, of the value of $605,000; that on July 19, 1923, 124 motors were ready for delivery and a large part of the remaining motors so ordered were in course of construction; that Weidely had purchased or contracted for the necessary materials and had engaged labor to manufacture the remaining motors so ordered; that Stutz was fully acquainted with the conditions existing in appellant's plant; that relying upon the contract, Weidely, in anticipation of the manufacture of the motors ordered, obtained and contracted for materials, and expended therefor $664,000, and had expended $500,000 for labor, that of the 4,000 motors so ordered by Stutz and not delivered, 124 were ready for delivery July 19, 1923, 1,685 were in the course of construction but not then ready for delivery; that "on July 19, 1923, when said Weidely had all necessary arrangements made to complete the manufacture and delivery of the uncompleted portion of said motors (namely, 1,685 motors), and while said contract was in full force and effect, *without any legal cause or excuse whatsoever, but in direct violation of its obligations and the rights of Weidely under said contract, Stutz notified Weidely to cease the manufacture of motors and to make*

*no further delivery of motors to it under said contract;
that after said time Stutz, without right, refused to take
and has never taken any of the additional motors from
Weidely which Stutz had contracted to take and ordered
under and pursuant to the terms of said contract,
although Weidely demanded that Stutz go forward and
fulfill said contract;* that by its refusal to accept and take
said motors and to permit Weidely to go forward with
the manufacture and completion thereof, Stutz thereby,
without legal right, excuse or cause whatsoever, *repudi-
ated, breached and violated said* contract; that at the
time of said breach of said contract by Stutz, Weidely
was *ready, able and willing to go forward and complete
and carry out its contract* for the manufacture and de-
livery of the remainder of said motors so ordered by
Stutz as aforesaid; that, as hereinbefore alleged,
Weidely, at all times, except so far as it was prevented
from so doing by Stutz, as aforesaid, performed all the
terms, conditions and obligations on its part to be per-
formed." (Our italics). That the materials Weidely
had on hands at the time of the alleged breach were of
the value of $300,000; that such materials could not be
used except in the manufacture of motors and because of
such breach Weidely was damaged because of deprecia-
tion in value of materials, $250,000; that it was damaged
$23,071, because of the depreciation of the 124 motors
alleged to have been ready for delivery July 19; and that
it was damaged $110,000 because of labor expended.

It also alleges that at the time of making the contract,
Stutz represented to Weidely that it would desire to have
motors manufactured at the rate of 10,000 a year for
at least two years and enjoined upon Weidely the neces-
sity of making adequate preparations to that end; that
appellant, relying upon the contract, purchased special
tools and equipment at a cost of $92,000, which would
not have been necessary except for the purpose of meet-

ing the requirements of appellee under the terms of the contract; that by reason of the alleged breach, the special tools and equipment have become of no value to appellant's damage in the sum of $92,000; that its profit on each motor under the contract was $30, and that by reason of the failure of appellee to take the 1,800 motors it was damaged in the sum of $54,000; that by reason of the breach of the contract Weidely became insolvent and that appellant was, on July 26, 1923, appointed receiver thereof in an action pending in the Marion Circuit Court.

The second paragraph is in substance the same as the first. The material difference between the two paragraphs is that in the second paragraph appellant sets out a letter of December 5, 1922, from Weidely to Stutz with reference to certain things which were to be done by Weidely in connection with financing itself so as to be able to go forward with and perform the conditions of the contract; a letter from Weidely to the attorney representing Stutz in the nature of a report as to what Weidely had done in the way of preparing its finances so as to fulfill the contract; a written order from Stutz, under date of December 6, 1922, for 500 motors, "subject to conditions on your (Weidely) letter of December 5, 1922, and purchasing contract therein referred to," the directions as to deliveries in the order being as follows: 15 at once, 35 in December, 100 in January, 150 in February, 200 in March; a letter from Stutz to Weidely dated January 2, 1923, confirming a conversation concerning delivery of motors; a letter from Weidely to Stutz, dated January 18, 1923, stating the daily program of Weidely as to the number of motors to be manufactured in January, February and March, the motors so expected to be ready for delivery during that time being 1,123, of which 523 would be for Stutz and 600 for the Auburn Company. This letter closed with the statement that the schedule named was not a definite promise on the part

of Weidely but was named as a mark to "shoot at," with an assurance that it would be increased if possible; that a few days later Stutz wrote a letter to Weidely, wherein, after referring to the two orders theretofore placed for deliveries from December to April for 1,500 motors, Stutz urged more rapid deliveries and gave Weidely authority to ship motors as fast as its facilities would permit; that this was followed by a letter from Weidely mentioning the fact that 50 motors which had been ordered delivered in January would be added to the number ordered for February, and that the company expected to make deliveries in March and April as ordered, and saying that schedule for May deliveries should be made in February so that orders might be placed for component parts far enough in advance to guarantee their delivery for fabrication. A letter from Stutz of February 5, insisted the deliveries should not be fewer than eight to ten a day. It is then alleged that Weidely proceeded to and did manufacture the motors called for in the order of December 6, all of which were received and paid for by Stutz; that on January 19, Stutz gave Weidely a purchase order for 1,000 motors, 250 to be delivered in March and 750 in April; that on March 19, Stutz gave another purchase order for 1,000 motors, 500 to be delivered in May and 500 in June, each purchase order contained the statement that it was subject to Weidely's letter of December 5, and the purchase agreement referred to therein; that after the last order was given the parties agreed that beginning with April, 500 motors should be delivered each month; that 500 were delivered in April, 436 in May, with 27 which were ready but which Stutz did not accept until after the last of May, and 421 in June; that on April 25, Stutz notified Weidely that it would want only 400 motors in June, but that Stutz afterwards accepted 421, in full compliance with its order and delivery contract; that on April 25,

Stutz gave another purchase order for 1,500 motors, 500 to be delivered in July, 500 in August, and 500 in September, this order being in form the same as the previous orders; that Weidely accepted all of said orders, and relying on them and the purchase contract prepared for the manufacture of the motors ordered; that in so doing it was required to and did purchase raw material to be used, about ninety days in advance of the time when the motors were to be delivered; that of the 4,000 motors so ordered, Weidely delivered 2,191. Like the first paragraph, it alleged that Weidely, relying upon said orders, purchased materials; that on July 19, 1923, Weidely had completed and had in process of completion the remaining 1,809 motors so ordered by Stutz; that up to that time Weidely had performed its part of the contract; that on July 19, 1923, while said 1,809 motors were manufactured or in the process of being manufactured and while Weidely had made all necessary arrangements to complete the same, and while said orders were in full force and effect, Stutz, *without any legal cause or excuse, refused to accept further motors or to assure Weidely that it would accept said motors at any time in the future, thereby repudiating and breaching the contract; and that Weidely had performed its part of the contract and was ready, able and willing to go forward and fully comply with the contract.*

From a judgment in favor of the defendant, plaintiff has appealed and assigns as error the overruling of his motion for a new trial.

As we view the case, the main question relates to the sufficiency of the evidence to sustain the verdict. The complaint alleges that on July 19, 1923, when 1,809 of the 4,000 motors ordered were undelivered, appellee, without any legal cause and in violation of its obligations and the rights of Weidely under the contract, notified Weidely to cease the manu-

facture of motors and to make no further deliveries of motors under the contract; that Stutz thereafter, without right, refused to take and never has taken any additional motors which it had ordered manufactured; and that Stutz thereby, "without legal right, excuse or cause whatsoever repudiated, breached and violated said contract."

In this connection, appellee calls attention to the provision in the contract whereby Weidely agreed "to increase or decrease deliveries," as Stutz might direct, and insists that it was clearly within its rights in asking Weidely to hold up deliveries of motors pending further advice. Appellee says this request was nothing more than a request to decrease deliveries.

The inference to be drawn from the evidence is that when the contract between Weidely and Stutz was signed, Weidely was not in a financial condition to carry out the contract. Because of Weidely's financial condition, Stutz, as a condition precedent to its entering into the contract to purchase its requirements of motors, required assurances that Weidely would be financially able to perform the contract, and Weidely, for that purpose executed a contract providing *inter alia*, that W. E. Showers would, within ten days, purchase of Weidely for cash at par $100,000 of its bonds, and that he would agree, in writing with Weidely to purchase additional bonds of the company from time to time, as funds might be needed to properly finance the company. Showers purchased the $100,000 Weidely bonds. The contract in question was signed December 5, 1922. Following this, Stutz gave Weidely four purchase orders as alleged in the complaint. Each of these orders stated that it was given pursuant to the contract and the letter of Weidely wherein the latter agreed so to arrange its finances as to be able to carry out the contract. The first order was given on December 5, 1922, for 500 motors, 50 to be delivered in December,

100 in January, 150 in February, and 200 in March. The second order given January 19, was for 1,000 motors, 250 to be delivered in March and 750 in April. The third order, given March 19, was for 1,000 motors, 500 to be delivered in May and 500 in June. The fourth and last order was given April 25, 1923, and for 1,500 motors to be delivered as follows: 500 in July, 500 in August and 500 in September. Seventeen motors were delivered in December, 1922. On and after January 2, 1923, communications between Weidely and Stutz both by telephone and by letter, concerning deliveries were frequent. Weidely was not able to make deliveries as rapidly as called on by the orders. The schedule called for 750 motors to be delivered by the last of March, although but 608 had been delivered at that time. The orders called for 2,500 to be delivered by July 1. Only 2,002 had been delivered according to the schedule. About June 1, there was a general slow-up in the automobile industry. The Auburn company ceased taking motors from Weidely early in June, and thereafter Weidely increased its deliveries to Stutz. Some time in June, Stutz suggested that because of the business conditions, Weidely should slow up its production of motors. Weidely said this was not possible. Later Stutz made the same request and stated it would take a percentage of a minimum production, if Weidely would request Auburn to do likewise. Up to July 19, Stutz took all motors which had been delivered to it. At this time it was overstocked and had 700 or 800 motors on hand. After one or more conversations on the subject, Stutz, on July 19, wrote a letter to Weidely and, after referring to a conversation had that day, said, "We would ask that you cease manufacture at once and hold up any further delivery of engines to us, pending further advice." Upon the receipt of this letter, a representative of Weidely called on Stutz.

Willian A. Umphrey, treasurer and general manager

of Weidely, testified that prior to the receipt of the letter of July 19, there were motors ready for delivery which had not been taken; that he had a talk with Klee, the Stutz purchasing agent, and asked him to send a truck for the motors; Klee said they were busy hauling other material but would try and get there that evening, but they did not get there; those motors were never hauled away; Klee told him they had all the motors they needed and that Weidely would have to hold up; he (Umphrey) said, "We can't hold up. We have to deliver them. We haven't any other customer. We have them manufactured, got an organization and nobody else to ship to. We have the material coming in"; that Klee said: "We can't accept them. We are loaded up"; that was about all the conversation over the telephone; witness got Mr. Weidely and they went up there and saw Thompson (the president of Stutz) and Klee; he stated the conversation by repeating in substance the conversation with Klee over the telephone; told them Weidely had an organization and had material coming in that they couldn't stop and asked what could be done about it; Thompson said he realized it was a tough proposition but there was a slump in business; that they had 700 to 800 motors on hand and could not move cars; witness said, "Well, what are we going to do? We are in one awful shape;" that Thompson said; "Perhaps the best thing to do is to go to the Auburn representative and see what can be done. In the meantime you had better wire all your sources to stop shipping." The witness then said, "If I do that, we are going to have a pile of men on our hands, I said, all right, we will wire them. It is the only thing to do;" that he wired 45 or 50 of them; had 124 motors on hand that day ready for shipment; asked Thompson if he would not take those, that they had a lot of men who had to be paid, and had to have money to pay them; Thompson said, "We can't take them right now;" got in touch with

Auburn people and made an engagement for July 25; told Thompson something would have to be done and asked if he would consider advancing Weidely $200,000 to pay part of amount due creditors on material so they could pay them and close the plant for two or three months. Nothing was done about advancing the money; Weidely offered to put motors in warehouse and put warehouse receipts up at bank to get money, if Stutz would take motors and pay for them as it needed them; Thompson was not willing to do that; had asked several creditors if they would hold off and they said they would not; told Thompson it was a case of having to do something or the creditors were going to ask for a receiver; that witness put the question to Thompson, "Well, do you intend to take any more motors at any time, or when do you intend to take any more motors? He couldn't say,— just as soon as they needed them. We asked him when he thought he would need them. He could not tell. It would depend on business conditions." There was a meeting on July 25, when representatives of the Auburn company were present. The situation was discussed. A representative of the bank was present and suggested that the only thing to do was to have a receiver appointed. It was finally agreed that the witness should apply for a receiver, which was done. The financial condition of Weidely was thoroughly discussed at this meeting. The witness told them Weidely was owing creditors from $250,000, to $300,000, and that some of them were pressing for their money. Weidely did not have sufficient capital to carry itself for a period of 30 or 60 days without financial assistance. Stutz had theretofore guaranteed an account of Weidely for crank shafts which it later paid and which, according to the testimony, amounted to $15,583. Before the receiver was appointed, Thompson said if Weidely could operate on ten motors a day, Stutz would take that many. Umphrey told him they

could hardly do that; he thought they could operate on 20 a day and manufacture ten a day for Stutz and ten a day for Auburn, but nothing came of that suggestion.

Mr. McBride, who was president of the bank with which Weidely was carrying its account and who was present at these meetings to give financial advice, testified that Thompson said Stutz was overstocked with motors and that it was asking Weidely to hold up deliveries for a time until it had a chance to unload some of them; that he asked Thompson how long it would be before Stutz would be able to take motors again; that Thompson said he did not think the business slump was anything but temporary and that within 30 to 60 days they would be able to take motors again.

Appellant's theory of the case is also supported by the testimony of other witnesses, whose testimony need not be set out. It is sufficient to say that it corroborated that theretofore set out.

William M. Thompson testified as a witness for appellee. He was president of Stutz in 1922 and 1923, but had no connection with the company when this case was tried. He testified that immediately after the contract was signed, he had a conversation with Umphrey on the subject of deliveries. Around the first of the year he told Umphrey they would have to take deliveries according to Stutz's schedule as they had orders for cars. Umphrey assured him deliveries would be made according to specifications as soon as materials came in, which would be within a month; that Umphrey was at the office of witness three or four times every week, when the subject of deliveries was discussed; that in the latter part of January or early in February he told Umphrey he had a great number of orders for cars, and that unless they could get motors there would be many cancellations of orders; that they did have 1,200 to 1,500 cancellations; that Umphrey said they were having trouble in meeting

their pay roll and that it would be an accommodation to them if payments were made each day for motors delivered; that thereafter payments were so made; that Umphrey said Wyman-Gordon had refused to accept their orders for crank shafts unless the account was guaranteed by Auburn or Stutz; that after further conversation, Stutz guaranteed that account, which, by other evidence, is shown to have amounted to over $15,000; that in June he had a talk with Umphrey about business conditions in which he told him there was a general slow-up in business; that it would be necessary for Stutz to slow up in its production and for Weidely to slow up in its production; that Umphrey said that was impossible, that they had materials coming in and would have to keep up production; that he had several such talks with Umphrey telling him to reduce production of Stutz motors; that Umphrey said Auburn was not taking any motors and that Stutz was getting their entire production; that witness told him he felt it was necessary to get a representative of Auburn and see what could be done toward their taking motors; that Stutz was willing to take some if Auburn would take some and for Umphrey to figure what was the least production on which he could operate; several days passed and the Auburn representative did not come; Stutz continued to receive motors; witness asked Umphrey to come and see him, when witness insisted there must be an understanding about receiving motors. There was no meeting with the Auburn man before Stutz's letter of July 19, to Weidely. Thompson told Umphrey he was holding up until they had a meeting to see what Auburn was going to do; that he did not say Stutz was not going to take motors; told him it looked like a temporary slow-up and hoped it would only be a short time until they would be ready to take motors. Referring to the meeting on July 24, when McBride was present, witness said he told McBride busi-

ness conditions were such that Stutz could not continue to take deliveries immediately, nor could he tell just when they could start to take deliveries, but hoped it would not be long; that he told them Weidely should have sufficient money, in view of their daily payments for motors; that Umphrey said they did not have money to meet pay roll, much less pay bills for materials; that Showers said he did not intend to put any more money in the Weidely business and if Stutz did not want the motors, he did not intend to try to force it to take them; that he was tired of the business and asked why not appoint a receiver. He then gave his version of the conversation which resulted in Umphrey filing an application for, and the appointment of appellant as receiver for Weidely. He then told of a meeting the next day when Kemp, representing Auburn, was present; that he told Kemp Stutz had a great many motors on hand, that he had just learned Auburn was not taking any motors, that Umphrey had explained the Weidely situation, and that he, the witness, explained that it was not possible for Weidely to shut down, and suggested that Stutz would take a few motors during the period business was quiet in order to help Weidely; that he asked Umphrey to figure out the least number of motors he could build and keep his plant running; that Kemp said Auburn could not possibly take any of them, but hoped to start deliveries soon; that Showers (the financial backer of Weidely) said: "Well, if this is the way you fellows feel, I look upon you as my customers and I don't want to force you into taking these motors now if you feel you can't. If we can't run, we will close up the plant"; that Showers again mentioned the appointment of a receiver; that the day after the appointment of the receiver, the receiver asked if Stutz would take forty motors immediately and pay for them, as Weidely needed money for their pay roll; that witness told him Stutz would not take any more motors until

adjustment was made of the Wyman-Gordon affair, that being the account for crank shafts Stutz had guaranteed.

It was for the jury to say whether appellee repudiated and breached the contract, and also to determine whether Weidely was *able, ready* and willing to carry out the terms of the contract. We have not set out all of the evidence bearing upon either of these questions. We have set out enough of it to sustain a finding that appellee did not repudiate and breach the contract by refusing to take any more motors as alleged in the complaint. The contract expressly provided that Weidely should increase or decrease deliveries as Stutz might direct. This provision was doubtless placed in the contract to take care of a slow-up in the automobile industry. It was a provision inserted for the benefit and protection of appellee.

Weidely had but two customers for its motors,—Auburn and Stutz. Auburn was overstocked and ceased to take motors in the early part of June. When Stutz requested Weidely to decrease the deliveries of motors to it, Weidely was not able financially to do so and continue as a going concern. Its creditors were pressing for the payment of their accounts. Weidely was neither able to meet its pay roll nor to pay for materials which it had ordered. Stutz was willing to take ten motors a day. Umphrey said Weidely could not continue as a going concern unless it could deliver twenty motors a day, and when Stutz refused to take that many a receiver was appointed for Weidely on the application of Umphrey, after which Stutz was under no obligation to accept any motors. The evidence, in our judgment, is sufficient to sustain the verdict.

The court gave to the jury twenty-nine instructions. Appellant complains of the action of the court in giving seventeen of these instructions. By instruction 2, the court told the jury that under the issues the burden was on the plaintiff to prove the ma-

terial allegations of the complaint by a fair preponderance of the evidence, and after explaining what was meant by a preponderance of the evidence, said that if the plaintiff had failed to prove the material allegations of the complaint by a fair preponderance of the evidence, he would not be entitled to recover, but if he had so proven the material allegation of the complaint, the verdict should be for the plaintiff.

Appellant says the vice in this instruction is that the jury could not therefrom do other than understand that he was bound to prove the material allegations of both paragraphs of the complaint, when he would have been entitled to recover if he had proved the material allegations of either paragraph.

If separate and different breaches had been alleged in each paragraph of the complaint, there would be merit in appellant's contention. As heretofore stated, each paragraph of the complaint alleged a repudiation and breach of the contract. The first paragraph alleged the breach in general terms. The second paragraph set out evidentiary facts, but in the final analysis, this paragraph is in substance the same as the first. So far as we are advised, and so far as we are able to discover, all of the evidence introduced was admissible under either paragraph of the complaint. Appellant, in discussing the third instruction, says the theory of both paragraphs is that the contract was breached because appellee refused to take motors under purchase orders placed and accepted under the terms of the contract and that the cause of action was alleged in general terms in the first paragraph, while in the second paragraph all of the orders are set out. If it were conceded that the instruction is technically erroneous, it was not prejudicial.

In the third instruction, the court told the jury that the theory of the first paragraph of the complaint was

that the written contract had been violated, breached or repudiated, and not solely that there had been a breach of the shipping orders, and that in order that plaintiff could recover the jury had to find a breach of the original contract, that is, that a point was reached where appellee refused to take the engines or motors under the contract.   The objection made to this instruction is that it created a distinction between the written contract and the orders, while appellant's theory was that there was a breach of the contract only because there was a breach of the orders issued thereunder.   The court, in the first instruction, after informing the jury as to the allegations contained in the first paragraph of the complaint, stated that the second paragraph was substantially the same as the first.   We are of the opinion that the court correctly construed the theory of each paragraph of the complaint, and that the court did not err in giving the third instruction.

In the fourth instruction, the court told the jury that the meaning and legal effect of the contract was a question of law for the court, and then stated the legal effect of the contract.   Appellant says this contract covers eleven pages of the record while the instruction of the court states the effect of the contract in about thirty lines, omitting many provisions that should have been stated to convey a clear understanding of its meaning.   In other words, it is appellant's contention that the instruction is not as full and complete as he thinks it should have been.   Appellant makes no claim that the court did not correctly state the meaning.   He fails to indicate anything was omitted that should have been included.   No error has been shown in the giving of this instruction.

Appellant requested the court to instruct the jury that, if pursuant to the contract, appellee placed purchase or-

ders with Weidely to make and·deliver such motors, and that if appellee, without the fault of Weidely refused to permit the latter to make and deliver *any of the motors so ordered by it,* the verdict should be for the plaintiff. The court modified this instruction by striking out the italicized words and inserting in lieu thereof the words "any more motors under the contract." The instruction as modified is instruction No. 8, given by the court, of which complaint is made. In support of his contention that the court erred in giving this instruction, appellant says: "Here again the court was confused and attempted to create a distinction between the *general contract* and the *orders* given thereunder. The plaintiff was entitled to an instruction on the effect of the orders, at any rate under the second paragraph of complaint, which sets them out haec verba."

As heretofore stated, the contract is the foundation of the cause of action alleged in each paragraph of complaint. Under the contract, it was necessary that purchase orders should be given in order to authorize the delivery of any motors under the contract, and Weidely had no authority to deliver any motors unless they were ordered. When orders for motors were given, they were given pursuant to the terms of the contract, and when motors were manufactured and delivered, the work was done under the contract and not otherwise. If there is any confusion or any attempt to create a distinction between the contract and the orders, we are of the opinion that it cannot be attributed to the court. There was no error in this instruction of which appellant can complain.

In instruction 4, requested by appellant, the court was asked to instruct the jury that if appellee repudiated or breached *the contract* in question for certain specified reasons given to Weidely prior to the commencement of this action, it was bound by

such reasons and could not be permitted to defend on other grounds. This instruction was given as requested, except that the court inserted the words *"general written"* before the word contract. This was not error.

In instruction 14, the court instructed as to the effect of a rescission. Appellant contends the giving of this instruction was reversible error, because there was no answer of rescission. Appellant makes no claim that the giving of this instruction was not warranted by the evidence bearing on rescission and which had been admitted without objection.

We have given careful consideration to all of appellant's objections to the instructions given, but do not consider them of sufficient importance to justify an extended discussion of them. What we have said in relation to the instructions given by the court, necessarily disposes of the contention that the court erred in refusing to give certain instructions, as all of the instructions refused, of which complaint is made, were modified and then given as heretofore indicated.

The remaining contentions all relate to the admission and exclusion of evidence. Specifications 41, 42, 43, 44, 45, 55, 56, 57, 58 and 59 of the motion for a new trial relate to questions asked by counsel for appellee while cross-examining appellant's witnesses, Showers, Umphrey and Fletcher. Specification 41, as set out in the motion is as follows: "The court erred in overruling the objection of the plaintiff and in permitting the witness to answer the following question propounded to W. E. Showers, a witness for the plaintiff on cross-examination, to-wit.: 'Q. Are you the same Mr. Showers against whom a suit has been filed and is now pending in Room 2, brought by a number of preferred stockholders, a suit against yourself and Mr. Umphrey and Mr. Fletcher arising out of the Weidely financial situation?' to which ruling of the court the plaintiff at the time duly ex-

420

cepted." Each of the other nine specifications named above are similar to 41 and will not be set out.

Specifications 65, 66, 67 and 68 relate to the exclusion of testimony and present the same question. Specification 65 is as follows: "The court erred in sustaining the objection of the defendant and in refusing to permit the witness to answer the following question propounded to William A. Umphrey (recalled), a witness for the plaintiff on direct examination, towit.: 'Q. I wish you would state what, if anything, was said by you and by Mr. Thompson concerning the subject of Weidely's procuring special tools, jigs and fixtures for the construction of the Stutz motor along in the fall of 1922?' to which ruling of the court the plaintiff at the time duly excepted."

Specifications 87, 88, 92, 93, 94 and 95 relate to testimony admitted over the objection of appellant and present the same question. Specification 87 is as follows: "The court erred in overruling the objection of the plaintiff and in permitting the witness to answer the following question propounded to William M. Thompson, a witness for the defendant on direct examination, towit.: 'Q. Who was present at that meeting?' to which ruling of the court the plaintiff at the time duly excepted."

Specifications 89, 90, 91 and 96, relate to admission of Exhibits "G" and "H" over appellant's objections. Specifications 100 to 108 relate to questions asked by appellee of its witness, Thompson, and answered over appellant's objections. These questions relate to the purchase by appellee of motors and motor parts from Showers, who purchased the Weidely stock of motors and motor parts at the receiver's sale. We will consider and set out Specification 100 only, as each of the others is in substance the same as 100, which is as follows: "The court erred in overruling the objection of the plaintiff and permitting the witness to answer the following question propounded to William M. Thompson, a witness

for the defendant on direct examination, to-wit.: 'Q. After the sale of the merchandise by the receiver, did you purchase the parts that had been manufactured by the Weidely Company?' to which ruling of the court the plaintiff, at the time, duly excepted."

Specification 123 is that: "The court erred in over-ruling the objection of the plaintiff and permitting the witness to answer the following question propounded to E. T. Klee, a witness for the defendant on direct examination, to-wit.: 'Q. After the receiver was appointed, Mr. Klee, I will ask you whether the Stutz Motor Car Company purchased parts from the receiver?' to which ruling of the court the plaintiff, at the time, duly excepted."

Appellee says that, excepting Specifications 89, 90, 91, 93, 95 and 96, of the motion for a new trial, no question is presented as to the admission or exclusion of evidence for the reason that "the motion for a new trial does not show the evidence offered or excluded." Appellee insists that unless such a showing is made the alleged error is not properly presented and should not be considered.

This question was discussed in *Dunn* v. *State* (1904), 162 Ind. 174, 178, 70 N. E. 521, 522, where the court said: "A litigant who desires to present to an appellate tribunal for review rulings of the trial court made in the course of the trial, and which he deems erroneous and prejudicial, *is required to state such controverted matter in a motion for a new trial* in such terms as will clearly indicate to the court the identity of the particlar subjects and rulings complained of. The principal object of the rule is to give the *trial court* a further opportunity to consider and correct any error he has made while the case is still under his control." (Our italics.)

The specification in the motion for a new trial need not set out the question and answer in full. The law and its purpose are satisfied if the name of the witness and the subject and substance of the point are stated in such language as will apprise the

trial court with reasonable certainty of the *character and scope* of the particular ruling. *Dunn* v. *State, supra.* To the same effect, see *Ohio, etc., R. Co.* v. *Stein* (1892), 133 Ind. 243, 257, 31 N. E. 180, 32 N. E. 831, 19 L. R. A. 733. "The rule is that the cause assigned for a new trial must be sufficiently definite and specific as not to impose upon either the trial or appellate court the task of searching the record for the alleged erroneous ruling." *Reese* v. *Caffee* (1892), 133 Ind. 14, 32 N. E. 720, 721.

In *Indianapolis, etc., R. Co.* v. *Ragan,* 171 Ind. 569, 86 N. E. 966, the motion for a new trial assigned as a reason the overruling of the plaintiff's (appellant's) objection to a question asked a named witness, followed, as in the instant case, by the question. In holding the specification in the motion for a new trial was not sufficiently specific, the court, at pages 572 and 573 said:

"Here is set out merely the question as propounded to said witness, but the motion for a new trial is entirely silent in respect to any answer which was elicited from the witness by the question, or as to any evidence given by said witness in response thereto. . . . The mere assignment that the court erred in overruling appellant's objection to the question, standing alone in the motion, without there being any showing whatever that the witness answered the question propounded, and what, if any, evidence was elicited from him in response thereto, certainly cannot be said to reveal any error arising out of the alleged ruling of the court. If no evidence was elicited from the witness by the question, the error, if any, in merely propounding it would, to say the least, be harmless to appellant. So far as the motion for a new trial discloses, no error is predicated on the ruling of the court in permitting the witness to give any evidence which was not proper or legitimate, but the alleged error is based wholly upon the action of the trial court in over-

ruling appellant's objections to the question. It has repeatedly been affirmed and held by this court that in the reasons assigned for a new trial, because of the improper admission or rejection of evidence, the motion must point out with reasonable certainty what evidence was improperly admitted or excluded, or, in other words the motion should name the witness and disclose what particular evidence was admitted or rejected."

In *Dunn* v. *State, supra,* the defendant, on cross-examination, had been asked a question for the purpose of laying the foundation for impeachment. The question was such that an affirmative answer would have tended to degrade the witness. The witness denied having made the statement attributed to him, and in rebuttal a witness was asked whether the defendant made the statement. Over the defendant's objection she answered in the affirmative. In the motion for a new trial, the specification was that the court erred in allowing the witness for the state on rebuttal to answer the question. Neither the answer of the witness, nor its substance was set out in the motion. The court called attention to the fact that the question was one that could have been answered only by "yes" or "no," that since it was asked on rebuttal and the defendant was complaining of its answer, when a negative answer could have done no harm, and said: "That the answer was in the affirmative would be implied to any intelligent court from the fact that the party against whom it was directed was in court complaining about it." So in the instant case, Specification 41, in the motion for a new trial states the name of the witness, the question and that it was asked on cross-examination. It called for a "yes" or "no" answer. A negative answer could not have harmed appellant. Appellant, however, was before the trial court complaining about the action of the court in allowing the question to be answered. In the words of the court

in the Dunn case: "The way the subject was presented to the court left no room for conjecture, or even doubt, as to the particular item of evidence and the ruling referred to, and this was abundantly sufficient." Assuming, therefore, that the answer to the question was "yes," as appellant could not have complained if the answer had been "no," it seems clear to us that the court did not commit a reversible error in overruling the objection to the question. The answer could have done no more than identify the party and in connection with other evidence that might have been introduced have affected the weight of his testimony. What we have said about Specification 41, applies to Specifications 42, 43, 44, 45, 55, 56, 57, 58 and 59. Specifications 100, 102, 105, 107 and 123 relate to the overruling of objections to questions that could have been answered either "yes" or "no." The subject matter of these questions, however, is not of such a character that we can say with any degree of certainty what the answer to any of them was. The fact that appellant complains about the answers does not necessarily justify an inference that the questions were answered a certain way. It follows that these specifications are not governed by what we said concerning sufficiency of specification 41. We, therefore, conclude that Specifications 100, 102, 105, 107, and 123, are not sufficiently definite to present any question. Specification 101, related to the overruling of appellant's motion to strike out the answer of the witness to the question mentioned in Specification 100, and is not sufficiently specific, in that no information is given as to what the answer was. The answer may have been perfectly harmless.

The questions referred to in Specifications 65, 66, 67, 87, 88, 92, 93, and 94 were not answerable by "yes" or "no." Some of them called for statements of what certain persons had said. Others called for the costs of making patterns, etc., which were

used in making motors, what was paid for certain motors and what was said by some of the interested parties, without setting out anything except the questions asked. It follows from what we have heretofore said, that none of these specifications present any error. Specifications 89, 90, 91, and 96 relate to the admission of Exhibits "G" and "H."

Appellant objected to the introduction of Exhibit "G," as a whole, and when this objection was overruled he objected to the part referring to Auburn Special. This objection was also overruled and exception saved to each ruling. The exhibit was read in evidence, and was followed by a question asking what, if anything, was said by Umphrey at the time as to the amount of money required for labor in constructing the motors referred to in the Exhibit and, over objection and exception, said it would require $50,000, for a thousand motors. The estimated cost of 5,850 motors including material, as shown by Exhibit "G," and labor was thus shown to be in excess of $493,000. Showers said he was not willing to furnish any more money to continue the operation of the company.

A financial statement of Weidely showing its condition on July 26, 1923, just prior to appointment of receiver and being Exhibit "H" was then identified and, over appellant's objection, was introduced in evidence. This ruling is the 95th reason for a new trial. This exhibit covers sixty pages of the record. This statement as it seems to us had a direct bearing on the question of Weidely's ability to carry out the contract and was properly admitted in evidence.

Referring specifically to Specifications 87 and 88, the record discloses that the witness, Thompson, had testified at length to circumstances prior to the appointment of the receiver. His attention was then called to the appointment of the receiver, and he was asked if following such

appointment he had a talk with Umphrey or with Fletcher. Over the objection of appellant, the witness said he did. In answer to other questions he said this conversation took place the next day after receiver was appointed and that Umphrey and Fletcher were both present, and without objection he testified as to what was said at that time. His attention was then directed to September, 1923, and he was asked if he attended a creditor's meeting at which Umphrey and Showers were present. He said he did, after which he was asked who was present at that meeting. Appellant objected to this question and after a statement by counsel for appellee that the purpose of the question was preliminary, the objection was overruled. He then told who was present and, after saying the affairs of Weidely were discussed, he was asked to state in substance what was said at that meeting by Showers and Umphrey and those present. This is the question referred to in Specification 87. Following appellant's objection to this question, the court, after saying it would have to be limited to Showers and Umphrey, overruled the objection. Counsel for appellant then asked that it be so limited, and the words "and those present" were omitted and the witness, without any further objection and without any exception being taken, said that after being shown a list of parts and a statement of the expense necessary to build certain quantities of motors, Showers said he would not advance any more money for such purpose. Exhibit "G" was then identified as the statement which had been shown to Showers and which had been brought to the meeting by Umphrey. This exhibit was an estimate prepared to show what the materials necessary to build motors would cost. The estimate was divided into three classes: (1) "Interchangeable material needed to build motors;" (2) "Special Stutz material to build motors;" and (3) "Special Auburn material needed to build motors." The esti-

mated cost of manufacturing 5,850 motors was: for interchangeable material $81,765.29; for Stutz Special, $25,430.66; and for Special Auburn, $93,911.57; a total of $201,107.52.

Exhibits "G" and "H" were properly admitted in evidence. The question of the ability of Weidely to perform the contract by manufacturing and delivering the motors was one issue involved. These exhibits were proper evidence on that question.

The motion for a new trial in the instant case contained 123 specifications, covering forty typewritten pages of the record. While these specifications name the witnesses, none of them other than as stated above, set out with reasonable certainty the particular evidence admitted.

Having passed upon all questions presented by appellant concerning the giving and refusing to give instructions, it is not necessary for us to determine appellant's contention relating to the action of the court in denying appellant's application for an order *nunc pro tunc* concerning the filing of the instructions, reserving exceptions to the giving and refusing to give the same. Nor is it necessary for us to discuss all of appellant's contentions relating to the admission and exclusion of evidence. What we have heretofore said in passing upon the admissibility of evidence sufficiently answers all of appellant's contentions on this subject.

Judgment affirmed.